UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CURTIS WHEAT,

       Plaintiff,                                Case No. 1:11cv737

vs.                                     Chief Judge Dlott
                                         Magistrate Judge Bowman

FIFTH THIRD BANK,

       Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff brings this action through counsel against defendant Fifth Third Bank ("Fifth Third") alleging that defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*; and in violation of Ohio Rev. Code § 4112.02(A). This matter is now before the Court on Defendants' motion for summary judgment (Doc. 37); Defendants' proposed undisputed facts with supporting depositions and attachments (Docs. 31-36, Doc. 37, Ex. 1-18); Plaintiff's memorandum and supporting attachments, including his response to Defendant's undisputed facts. (Doc 66, Ex. 1-12, Doc. 67). Defendant's motion for summary judgment has been referred to the undersigned for initial consideration and a report and recommendation. 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I now recommend that the Defendant's motion for summary judgment be GRANTED.

### I. Background and Facts

Plaintiff, Curtis Wheat is an African American male and a former employee of Fifth Third Bank ("Fifth Third"). Fifth Third initially hired Wheat in 2001 to work as a Sorter Processor. (Doc. 34, Wheat Dep., at 53). In 2002, Plaintiff transferred to the

Wholesale Lock Box Department and worked as a Payment Processor. *Id.* at 57.  In this position, Plaintiff processed checks for various Fifth Third customer accounts, which involved "reassociation" of the check, scanning it and mailing the processed check back to Fifth Third's customers. *Id.* at 57-58. Plaintiff worked in the Wholesale Lockbox Department as a Payment Processor until August 17, 2009, when Plaintiff's role changed to that of an Auditor. *Id.*, at 58-59.  As an Auditor, Plaintiff was responsible for auditing the work of the other Payment Processors in the department.  *Id.* During the relevant period, Plaintiff worked the second shift, from 3:00 p.m. to 11:00 p.m.  *Id.* at 60. Plaintiff had various supervisors during his employment in the Wholesale Lockbox Department, but at the time of his termination, Jason Curfiss ("Curfiss"), a Caucasian male, was his immediate supervisor. *Id.* at 61.  Brad Hatfield ("Hatfield") is a Caucasian male and a former employee of Fifth Third.  Hatfield worked as a Payment Processor. (Doc. 33, Hatfield Dep., at 8).  Plaintiff was responsible for auditing Hatfield's work as well as the other payment processors in the Wholesale Lockbox department that worked on the CHP account.  *Id.* 66-70.  Hatfield also reported directly to Curfiss. (Hatfield Dep., at 9).

*February 19, 2010 Incident*

On Friday February 19, 2010, Plaintiff arrived at work a little early (around 2:50 p.m.); and prior to clocking in, Plaintiff decided to stop at the packaging desk to talk with a co-worker, Lateascha McNear ("Tish").  (Plaintiff Dep., at 81, 82).  While Plaintiff was speaking with Tish, he saw Hatfield at the mail desk fumbling with his tray and grimacing/making facial expressions to his tray. *Id.* at 82, 83-85.  Because Plaintiff was responsible for auditing Hatfield's work, Plaintiff assumed that Hatfield's alleged

2

frustration was due to his discontent with Plaintiff's prior audit of his work.  (Plaintiff Dep., at 82: 21-25; 83: 1-17.  Plaintiff then approached Hatfield and asked "Is there a problem?" (Plaintiff Depo., at 83, 84).  Hatfield asked Plaintiff "what do you mean is something wrong?" (Plaintiff Dep., at 83:8-17).  Plaintiff then responded saying "you don't answer a question with a question" and Hatfield told Plaintiff he wasn't afraid of him, among other things.  (Plaintiff Dep., at 83-84).  As a result of this exchange, Sami Badawi ("Badawi"), a former Fifth Third employee, notified Jason Curfiss, because he thought a potential fight might occur between the two of them.  (Doc. 37, Ex. 2, Curfiss Statement).  However, by the time Curfiss arrived in the area, Plaintiff and Hatfield were each at their assigned work area. *Id.*   According to Plaintiff, his exchange with Hatfield ended when he decided to leave the area, go clock in and begin his job duties.  (Plaintiff Dep., at 84).

Hatfield also left the department, however he returned a few minutes later and asked Plaintiff if he had a problem with him. (Plaintiff Dep., at 85, 86:1-25).  Hatfield then asked Plaintiff if he was PMSing, Plaintiff said something sarcastic in response, and the argument got loud.  *Id.* at 87-88.  Anna Jordan, another Fifth Third employee who worked in their department as the first shift auditor, recommended that they take the discussion "off the floor."  *Id* at 87-89.  Plaintiff then suggested they go talk in the hallway so they didn't get other employees involved, and Hatfield agreed.  *Id.* at 89. According to Plaintiff, Hatfield told him that he didn't know what he was capable of, and swatted Plaintiff's arm.  Plaintiff then called Hatfield a "little bitch" repeatedly. *Id.* 90-91. Plaintiff claims he can't recall whether his fingers were in Hatfield's face when Hatfield swatted his arm, but they were both in each other's "personal space." (Plaintiff Depo., at

3

94:18-25).  Thereafter, other employees alerted Badawi about the altercation between Plaintiff and Hatfield.  (Doc. 32, Badawi Dep., at 16, 17).  Badawi again contacted Curfiss because he believed a physical fight was about to occur between Plaintiff and Hatfield.  (Doc. 34 at 92; Doc. 32 at 16, 17; Doc. 31 at 31).

When Curfiss arrived for the second time, Plaintiff and Hatfield were engaged in a heated exchange and were standing very close to each other.  (Doc. 31 at 31, 32). They were "borderline yelling at each other," and the situation continued to intensify.  *Id.* at 33.  Plaintiff was pointing his fingers in Hatfield's face and was repeatedly calling Hatfield a "little bitch."  *Id.* at 32.  He also heard Hatfield saying "you're not worth it, I've got a family."  *Id.*  Curfiss cautioned both of them not do anything that would get them fired.  *Id.*  Plaintiff admitted that both he and Hatfield's behavior was unprofessional. (Doc. 34 at 110).

Curfiss eventually got the two of them to separate and Curfiss convinced Plaintiff to walk with him to a conference room. (Doc. 31 at 32). Curfiss then went to Susan Lohstroh's office to report the argument.  Id.  Susan Lohstroh was Curfiss' immediate supervisor at the time.  *Id.* at 15.  Lohstroh then contacted Michelle "Mia" Healy ("Healy").  Healy was the Employee Relations Consultant for Fifth Third at the time. (Doc. 36, Healy Dep. at 7, 8).  Healy immediately began an investigation into the incident.

*Fifth Third's Initial Investigation of the Incident*

Curfiss went to Plaintiff's workstation and told Plaintiff he needed to come to the conference room so they could meet with Healy.  Curfiss, Lohstroh and Healy were present during the interview but Healy did most of the talking.  (Doc. 34 at 97).  Healy

4

identified herself, explained what her role was, and informed Plaintiff that she was conducting the interview to find out Plaintiff's version of what happened between him and Hatfield. (Doc. 36 at 55). Plaintiff admits that during the interview, Healy asked him questions but he never responded because the thought her questions were "irrelevant to the incident." (Doc. 34 at 98). Plaintiff claims he was frustrated because he felt Healy wasn't giving him the opportunity to tell his side of the story. *Id.* at 111. Plaintiff testified that he never told Healy what happened from his perspective. *Id.* at 112.

According to Plaintiff, he felt that he was being interrogated, and therefore only responded to questions that were directly related to the altercation. Thus, when Healy asked him a question that he deemed relevant, he responded. (Doc. 34., at 99). Specifically, when she asked him if he said anything to Brad, he told her "I called him a bitch multiple times." *Id.* Plaintiff testified that he was frustrated during the interview so he interrupted Healy, was "being rude" and "talking over top of her." *Id.* at 99, 100. Plaintiff got so frustrated that he laid his badge down on the table and said he resigned. *Id.* at 100. Susan Lostroh then asked Plaintiff if that meant he was resigning; in response, Plaintiff picked up his Badge. *Id.* Lohstroh asked Plaintiff if he had to do the whole situation with Hatfield all over again would he do anything differently and he said no, he would do the same exact thing. *Id.*

Healy's testimony concerning her recollection of her interview with Plaintiff is similar to Plaintiff's version of the events. Healy took detailed notes during her interview with Plaintiff. (Doc. 37, Ex. 3.) Healy testified that during the interview Plaintiff was uncooperative and non-responsive when she asked him questions. (Doc. 36 at 55). She also said that whenever she asked Plaintiff a question, Plaintiff redirected irrelevant

questions back to her instead.  *Id.*  Healy said that Plaintiff talked over her, had trouble maintaining his composure and would come out of his chair.  *Id.*  She said Plaintiff was loud, rude and disruptive.  *Id.*  She also testified that he threw his badge across the table indicating that he resigned.  *Id.* at 57.  When Healy tried to get Plaintiff to tell his version of the story, the only thing she was able to garner from him was that Plaintiff thought Hatfield looked at him funny and Plaintiff called Hatfield a "little bitch."  *Id.* at 55, 55.  Plaintiff also made threatening statements like "I'll take care of it myself" and "Monday is going to be a big day," but when Healy asked him what he meant by these statements, Plaintiff refused to answer.  *Id.* at 56 at 56.  Plaintiff continued making veiled threats which led Healy to believe there was a potential threat of workplace violence.  *Id.* at 58, 64.  Ultimately, Healy realized that the interview was not productive, so she informed Plaintiff that he was being sent home with pay, she would contact him on Monday after she had a chance to investigate the matter, and he should not report to work until she contacted him.  *Id.* at 58.  *See also* Doc. 34 at 100.

Curfiss' testimony concerning his recollection of the interview with Plaintiff  is also similar to that of Plaintiff's and Healy.  Curfiss testified that Plaintiff was "still very agitated" and was not being very cooperative about giving details about the situation. (Doc. 31 at 37).  Curfiss also testified that Plaintiff threw his badge on the table signifying that he resigned.  *Id.* at 38.  Curfiss also remembers Plaintiff saying "Monday is going to be a big day."  *Id.*  Curfiss prepared a written statement of the incident and submitted the statement to Healy.  (Doc. 37, Ex. 2.)

After Plaintiff's interview, Healy interviewed Hatfield.  Healy testified that Hatfield was fully cooperative, calm and answered all of Healy's questions.  (Doc. 36 at 60).

6

During the interview, Healy asked Hatfield what happened and he shared his side of the story. *Id.* at 60, 61. Hatfield did not make veiled threats like Plaintiff, so Healy did not think he posed a risk to the bank, and they allowed him to return to work for his next scheduled shift. *Id.* at 62.

Healy was not familiar with the employees in the department, so she asked Curfiss to identify any employees in the department that may have witnessed the incident. *Id.* at 65, 66. Curfiss recommended that she interview Sami Badawi and Tish McNear. *Id.* He also recommended that she interview Judith Clark. However, Judith Clark stated that she didn't see anything and she couldn't stay because she had a bus to catch. *Id.* at 66. With respect to Sami Badawi's interview, Badawi told Healy that he overheard Plaintiff ask Hatfield if he had a problem with him. Badawi's stated that they got loud and went into the hallway. He then notified Curfiss. (Doc. 36 at 66, 67). Healy also took notes of her initial interview with Sami Badawi. (Doc. 37, Ex. 5).

Healy also interviewed Tish McNear regarding the incident. Tish's initial version of the incident was very short. Tish told Healy that Hatfield was pitching mail when Plaintiff approached Hatfield and asked if he had a problem with him. She said she really didn't pay that much attention and she continued doing her work. (Doc. 36 at 68). During this initial interview, Tish did not tell Healy that Hatfield came back and reignited the argument with Plaintiff. *Id.* Healy took detailed notes during her interview with Tish. (Doc. 37, Ex. 6).

*Initial Decision to Terminate Plaintiff*

Based on the information she learned during the witness interviews, Plaintiff's refusal to cooperate during his interview, and the veiled threats Plaintiff made during his

interview including "Monday is going to be a big day" and "I'll handle it myself;" Healy believed that Plaintiff would cause physical harm to Fifth Third employees if he was allowed to return to work. (Doc. 36 at 58, 71, 118, 119.)  As a result, Healy decided to terminate Plaintiff's employment.  (Healy Depo.#2, at 70:17-22).  On Monday February 22, 2010, Healy telephoned Plaintiff and notified him that Fifth Third decided to terminate his employment. (Doc. 34 at 75; Doc. 36 at 69).

Healy concluded, based on the information she obtained during the initial witness interviews, that Hatfield was not the aggressor and he did not pose a threat to Fifth Third employees.  As such, he was allowed to return to work.  (Doc. 36, 73).  Fifth Third, however, did give Hatfield a written warning (corrective counseling documentation) for his unprofessional behavior and failing to get a supervisor involved.  (Doc. 37, Ex. 7; Doc. 36 at 73).

*Fifth Third's Subsequent Investigation of the February 2010 Incident*

On March 30, 2010, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination against Fifth Third because Fifth Third terminated his employment but did not terminate Hatfield. Thereafter, in April 2010, Healy investigated the matter further with assistance from J. Phenise Poole, Esq., who was the in-house employment counsel for Fifth Third at the time.  Healy and Poole re-interviewed all of the witnesses Healy interviewed the first time around, with the exception of Plaintiff.   (Doc. 36 at 123-125:1). Curfiss also discovered there were additional employees who witnessed the incident and may have more information about what happened, including Ana Jordan ("Jordan") and Judith Clark ("Clark").  Healy then interviewed Jordan and Clark as well.  *Id.*

8

During Hatfield's second interview, Hatfield admitted, for the first time, that when Plaintiff put his fingers in Hatfield's face, Hatfield swatted Plaintiff's hand away, which is a violation of Fifth Third's workplace violence policy. (Healy Depo., at 119:15-23). Hatfield also admitted, for the first time, that the initial argument between him and Plaintiff had resolved, but he reignited the argument. (Healy Depo.#2, at116- 118:1-5). Healy took detailed notes of her second interview with Hatfield. (Ex. 8.)

Tish McNear was also interviewed again. During her second interview, Tish told Healy that the initial argument between Plaintiff and Hatfield had resolved, they both went back to their seats, and that Hatfield reignited the argument by going over to Plaintiff's desk later on. *Id.* Healy conducted two additional interviews with Badawi. Badawi did not provide any additional information concerning the altercation between, Plaintiff and Hatfield. (Doc. 37, Ex. 10).

*Termination of Hatfield*

Based on the additional information Healy obtained during the second round of interviews, Healy concluded that although Plaintiff was the initial aggressor, Hatfield reignited the argument and was also an aggressor, therefore they were both equally at fault for what happened. (Doc. 36 at 120). Hatfield also lied during his initial interview and failed to accurately relay the events. *Id.* at 131. Consequently, Healy terminated Hatfield as well. *Id.* at 116.

*Fifth Third's Policies*

Fifth Third has a written employee handbook which contains a workplace violence policy and an anti-harassment policy. (Doc. 37, See Ex. 13, pgs. 7 and 5.) Fifth Third also has Core Value Statements which are posted on the walls in the

9

common areas and frequently published in the electronic newsletter distributed to all Fifth Third employees from time to time. (Doc. 37, Ex. 14; Doc. 36 at 132). Fifth Third requires all of their employees to log into their computer system and provide their electronic signature acknowledging that they have received, read, and understood the employee handbook that is made available to them online on a yearly basis. *Id.* at 133. Each employee has the responsibility to read the handbook before they sign the acknowledgment. *Id.* at 134. Plaintiff provided his electronic signature confirming his receipt of the employee handbook. (Doc. 37, Ex. 15). During his deposition, Plaintiff acknowledged that he has read the employee handbook "multiple times." (Doc. 34 at 121).

Fifth Third also issued a Memorandum to all the employees in the Wholesale Lockbox Department called "Employee conduct and standards." (Doc. 37, Ex. 16). This document reminded employees about various Fifth Third policies including the bank's policy concerning professionalism. *Id.* The professionalism policy states that "profanity, under any circumstances, is unacceptable and has no place in the work environment." *Id.* The policy further states that "[i]nsensitive, derogatory or discriminatory language will not be tolerated." *Id.* During his deposition, Plaintiff acknowledged that he received and signed this document and that he was aware of Fifth Third's policy against profanity in the workplace. (Doc. 34 at 123, 124.)

*Plaintiff's EEOC Charge and the Instant Action*

As stated above, on March 30, 2010, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination against Fifth Third. (Doc. 1, Ex. A). Thereafter, on November 8, and 10, 2010, Ms. Poole

10

submitted letters to the EEOC setting forth Fifth Third's position regarding Plaintiff's charge of discrimination, wherein she states, inter alia, that "Plaintiff was terminated for violating Fifth Third's policies and procedures; although the letters do not state which policies and procedures were violated.  (Doc. 66, Exs. 11, 12).  In a letter dated April 27, 2011, Ms. Poole states that Brad Hatfield was terminated for violating Defendant's policies.  (Doc. 66, Ex. 13).

On July 25, 2011, the EEOC issued a determination that it found reasonable cause to believe that violation of the statute occurred with respect to some or all of the matters outlined in Plaintiff's charge.  However, the EEOC was unable to obtain a settlement with Fifth Third on Plaintiff's behalf.  That same day, the EEOC issued a 90-day notice of right to sue letter to Plaintiff.  (Doc. 1, Ex. C).  The notice further stated that the EEOC declined to pursue the charge on Plaintiff's behalf.  *Id.*

Plaintiff then filed the instant action on October 20, 2011 alleging that Defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*; and in violation of Ohio Rev. Code § 4112.02(A).  Fifth Third now moves for summary judgment.

## II. Analysis

### A.  Summary Judgment Standard of Review

In a motion for summary judgment, "a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party."  *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations.  After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The 'mere possibility' of a factual dispute is not enough."  *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)).  In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).  The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor."  *Id.* at 255 (emphasis added).  The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided.  *Id.* at 251-52.

To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita,* 475 U.S. at 587 (citation omitted).  It is the Plaintiff's burden to point out record evidence to support his claims.  "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims."  *Abdulsalaam v. Franklin County Bd. Of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.,* 481 F.3d 369, 379 (6th Cir. 2007)).

### B.  Defendant's Motion for Summary Judgment

As detailed above, Plaintiff's complaint alleges that Defendant discriminated against him due to race in violation of Federal and state law.   Fifth Third now moves for summary judgment.  Fifth Third argues that Plaintiff cannot establish a *prima facie* case of race discrimination because he cannot show that he was treated differently than any similarly situated non-protected activity.  Assuming arguendo, that Plaintiff can establish a *prima facie* case of discrimination, Fifth Third asserts that it had a legitimate non-discriminatory reason for terminating Plaintiff's employment and Plaintiff cannot show that Fifth Third's proffered reason for his termination is a pretext for discrimination. (Doc. 37).  Plaintiff, however, claims that he is able to establish a *prima facie* case of discrimination because he was treated less favorably than similarly-situated Caucasian males.  He further argues that he can establish a genuine issue of material fact as to whether defendant's articulated reason for his termination is a pretext for discrimination.

### C. Defendant is entitled to Judgment as a Matter of law

#### a. *Applicable Law*

Title VII makes it unlawful for an employer to discharge an individual or to otherwise discriminate against an individual with respect to compensation, terms,

conditions, or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1).  The standards for establishing a discrimination claim under Title VII are equally applicable to plaintiff's claims under Ohio Rev. Code § 4112.  *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).

An employee may base his claim of employment discrimination on a theory of disparate impact or disparate treatment or both. *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987).  In the instant case, plaintiff proceeds under the disparate treatment theory of discrimination.  Under the disparate treatment theory, the plaintiff must show that the employer has treated some people less favorably than others because of their race, color, religion, sex or national origin.  Unlike the disparate impact theory, proof of discriminatory motive is critical in the case of disparate treatment. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Claims of disparate treatment are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582.  The *McDonnell Douglas* burden-shifting analysis requires that plaintiff first establish a *prima facie* case of discrimination. *Id.*

A plaintiff may establish a *prima facie* discrimination claim by either direct or circumstantial evidence. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010).  "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the

14

employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).  "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Id.*

A plaintiff who lacks direct evidence of discrimination may establish a *prima facie* case of discrimination through circumstantial evidence by showing that: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position lost; and 4) he was replaced by an individual outside the protected class.  *Mitchell,* 964 F.2d at 582.  Plaintiff may also establish the fourth prong of a *prima facie* case of discrimination by showing that he was treated less favorably than a similarly-situated individual outside the protected class.  *See Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).

If the plaintiff seeks to establish that he was treated less favorably than a similarly-situated individual, he must prove that all relevant aspects of his employment situation were similar to those of the employee with whom he seeks to compare himself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998).  To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id.* (quoting *Mitchell,* 964 F.2d at 583); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000).  The determination of whether the plaintiff and another employee shared the same supervisor must be made "on a case-by-case basis and

does not depend entirely on whether the two shared the same immediate supervisor."
*Barry v. Noble Metal Processing, Inc.*, 276 Fed. Appx. 477, 481 (6th Cir. 2008) (citing
*McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)).  "[I]n many instances, the term
'supervisor' should be construed broadly to include cases where both employees'
situations were handled by the same 'ultimate decision-maker.'" *Id.* (citing *McMillan*, 405
F.3d at 414).  Accordingly, a plaintiff and a comparable employee who are directly
supervised by different individuals may still be similarly situated if the same member of
management disciplined both of them.  *Id.* (citing *McMillan*, 405 F.3d 405; *Seay v. Tenn.
Valley Auth.*, 339 F.3d 454, 459 (6th Cir. 2003)).

"[T]he weight to be given to each factor can vary depending upon the particular
case."  *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).  The ultimate question
is whether employees involved in acts of "comparable seriousness" were nonetheless
retained.  *Clayton*, 281 F.3d at 611 (citing *McDonald v. Santa Fe Transp. Co.,* 427 U.S.
273, 283 n.11 (1976)).

The employer is entitled to summary judgment if the plaintiff does not establish a
*prima facie* case.  If the plaintiff establishes a *prima facie* case, the employer can
overcome the *prima facie* case by articulating a legitimate, nondiscriminatory reason for
the adverse employment action.  *McDonnell Douglas**,* 411 U.S. at 802.  If the employer
carries its burden, the plaintiff must show that the reasons offered by the employer were
not its true reasons, but were a pretext for discrimination.  *Id.* at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of
pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not
actually motivate the employer's decision; or 3) the reasons were insufficient to warrant

16

the decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Services,* 129 S.Ct. 2343 (2009). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, *i.e.*, the reason is factually false. *Id.* The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id.* For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, the plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. *Id.*

The Sixth Circuit has cautioned that *Manzer's* three-part test is not to be applied in a formalistic manner. *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Rather, the court must bear in mind that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* The court must ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong the evidence is. *Id.* The 6th Circuit in *Chen* explained,

> At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson*

*Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000). ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id.*

A plaintiff must allege more than a dispute over the facts upon which her discharge was based in order to establish pretext. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001). He must put forth evidence that demonstrates the employer did not "honestly believe" in the proffered nondiscriminatory reason for its adverse employment action. *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). An employer has an honest belief in its nondiscriminatory reason for discharging the employee "where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citing *Chrysler Corp.*, 155 F.3d at 807). In determining whether an employer "reasonably relied on the particularized facts then before it," it is not necessary that "the decisional process used by the employer be optimal or that it left no stone unturned." *Braithwaite*, 258 F.3d at 493 (quoting *Chrysler Corp.,* 155 F.3d at 807). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Chrysler Corp.*, 155 F.3d at 807). As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *Majewski*, 274 F.3d at 1117 (citing *Chrysler Corp.*, 155 F.3d at 806).

18

Summary judgment in favor of a defendant is appropriate where the plaintiff fails to establish a *prima facie* case or is unable to demonstrate pretext sufficient to rebut the defendant's legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993).  "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination *and* that the employer intended to discriminate on the basis of race." *Thurman*, 90 F.3d at 1166 (emphasis in the original) (citing *Hicks*, 509 U.S. at 502). The finder of fact may infer discrimination from the elements of a prima facie case, coupled with its disbelief of the rationale articulated by the employer.  *See Hicks,* 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . 'no additional proof of discrimination is required. . . .').  *See also Barnett v. Department of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir. 1998); *E.E.O.C. v. Yenkin-Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir. 1997); *Thurman,* 90 F.3d at 1166-67.

### B.  Plaintiff and Hatfield were not similarly-situated

Fifth Third argues first that it is entitled to judgment as a matter of law because Plaintiff cannot establish the fourth prong of a *prima facie* case of race discrimination. Notably, the last element in the *prima facie* analysis requires the plaintiff to show that he was treated less favorably than similarly-situated individuals outside the protected class. To be treated as similarly-situated, an employee must "have dealt with the same

supervisor [as the plaintiff], have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.  Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 801, 802 (6th Cir. 1994).

The plaintiff need not demonstrate similarity in all respects; and the Court should evaluate the factors discussed in *Mitchell*, *supra* at p. 10, to the extent they are relevant to the particular circumstances of the case.  *See Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 394 (6th Cir. 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Thus, Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)).

In this case, applying the standards set forth in *Mitchell*, *Ercegovich*, and *Pierce*, Fifth Third asserts that Plaintiff cannot establish that he was similarly situated to Hatfield.  In this regard, Fifth Third first asserts that Plaintiff and Hatfield were not similarly situated in job title and responsibilities.  As detailed above, Plaintiff testified that he was a second shift Auditor and Hatfield was a Payment Processor.  (Doc. 34 at 58-59).  While Plaintiff and Hatfield may have shared the same supervisor, Plaintiff's own testimony establishes that Wheat and Hatfield had different job responsibilities.  Notably, Plaintiff testified that he worked in the Wholesale Lockbox Department as a Payment Processor until August 17, 2009, when his role changed to that of an Auditor.

20

(Wheat Dep., at 58:22-15; 59:1-20).  As an Auditor, Wheat was now responsible for auditing the work of the other payment processors in the department, including that of Hatfield.  *Id.*  Plaintiff also testified that as of August 17, 2009, he worked exclusively as an Auditor and no longer performed any of the Payment Processor job duties.  (Wheat Dep., at 65).

Despite such testimony, Plaintiff now argues that he and Hatfield were both classified as payment processors during the relevant period.  In support of this contention, Plaintiff cites to Fifth Third's position statement submitted to the EEOC in response to Plaintiff's charge of discrimination.  (Doc. 66, Ex.11).  J. Phenise Poole, Esq., Fifth Third's in-house counsel, authored the statement.  Ms. Poole however, did not work with Plaintiff or in Plaintiff's department.  Moreover, Ms. Poole also included a disclaimer that the position statement was written based on the facts she believed were accurate at the time, but the facts stated in the position statement were not intended to be admissions and were not based on a comprehensive review of all the facts involved. *Id.* Accordingly, the undersigned finds that Plaintiff's contention is not well-taken.  As outlined above, the undisputed evidence, including Plaintiff's own testimony, shows that Plaintiff had different job responsibilities than Hatfield.

Next, Fifth Third asserts that Plaintiff cannot establish that he and Hatfield were similarly situated concerning their conduct during and after the altercation. Notably, Fifth Third asserts that unlike Hatfield, the undisputed facts establish that Plaintiff was the initial aggressor of the incident on February 19, 2010.  Plaintiff testified that he started the dispute when he confronted Hatfield and said "do you have a problem?" (Wheat Depo., at 83:1-17).  As noted by Fifth Third, courts have held that the Plaintiff was not

21

similarly situated to the other employee involved in the altercation when the evidence showed that the Plaintiff was the aggressor and/or initiated the dispute.  *See Love v. Kent Cty. Road Comm.*, 899 F.2d 14, App. No. No. 89-1232, 1990 WL 34127 (6th Cir.1990); *Boles v. Wal-Mart Stores, Inc.*, U.S. Dist. No. 2:07cv38-KS-MTP, 2008 WL 216528 (S.D. Miss. Jan. 23, 2008); *Freeman v. Kansas*, U.S. Dist. No. 97–2530, 128 F. Supp. 2d 1311(D. Kansas Jan. 29, 2001); *McWilliams v. Ruskin Co.*, U.S. Dist. No. 04-1018-WEB, 2006 WL 2795619 (Sept. 27, 2006 (D.Kan.)).   Thus, according to Fifth Third, but for Plaintiff's initial confrontation, none of the subsequent events that transpired that day would have occurred.

Fifth Third further contends that Plaintiff and Hatfield did not engage in the same conduct as Plaintiff during their respective interviews with Mia Healy following the incident and therefore were not similarly situated in all relevant aspects.  As detailed above, during his interview with Healy, Plaintiff did not cooperate and refused to answers Healy's questions.  In this regard, Plaintiff's testified that he did not respond to Healy's questions that he deemed "irrelevant to the incident." (Wheat Dep., at 98)  Plaintiff also testified that he was frustrated during the interview so he interrupted Healy, was "being rude" and "talking over top of her." (Wheat Dep., at 99, 100).  He also told Lohstroh that if he had to do the whole situation with Hatfield all over again, he would do the same exact thing.  (Wheat Dep., at 100).  When Healy tried to get Wheat to tell his version of the story, Plaintiff essentially only told her that Hatfield looked at him funny and therefore Plaintiff called Hatfield a "little bitch."  (Doc. 36, Healy Dep., at 55; 56).  In contrast, Hatfield fully cooperated during the interview, calmly answered all of Healy's questions and when asked what happened, he shared his side of the story. (*Id.* at 60,

61).

Plaintiff, however, disputes that he was the initial aggressor.  Instead, Plaintiff argues that the first confrontation he started with Hatfield was resolved, and Hatfield reignited the argument when he later approached Plaintiff's desk.  Plaintiff further disputes that his behavior during the interview process establishes he and Brad Hatfield are not similarly situated.  Plaintiff asserts that his behavior during the interview was the result of Healy interrogating him and telling him what occurred; as opposed to asking him to tell her what happened, as she did with Brad Hatfield when she interviewed him. Plaintiff maintains that Hatfield acted calmly because he was not interrogated by Healy in the same way as Plaintiff.  Plaintiff's assertions are not well-taken.

Even assuming Plaintiff's version of events, it remains undisputed that Plaintiff initial actions led to the subsequent incident with Hatfield.  Furthermore, assuming *arguendo*, that Healy asked interrogating questions, it remains undisputed that Plaintiff interrupted Healy, was "being rude" and was "talking over top of her." (Wheat Depo., at 99: 18-25; 100:1).  Moreover, Plaintiff has offered no evidence to establish that Healy's demeanor changed during her interview with Hatfield.  Here, the evidence establishes that Plaintiff and Hatfield were not similarly situated in all relevant aspects, as they did not share the same job duties and did not engage in the same conduct with respect to the altercation and the subsequent interviews by Fifth Third.  Such mitigating circumstances justify Fifth Third's individually tailored treatment of Plaintiff and Hatfield. *See Morris v. Family Dollar Stores of Ohio*, Inc. 320 Fed. Appx. 330 (6th Cir. 2009) (where an employee alleges discriminatory disciplinary action the individuals with whom the plaintiff seeks to compare his/her treatment must ... have engaged in the same

23

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it)(citations and quotations omitted).

In light of the foregoing, the undersigned finds that Plaintiff has failed to establish that he was treated less favorably than similarly-situated individuals outside the protected class.

D. *Fifth Third's legitimate non-discriminatory reason for Plaintiff's termination and Plaintiff's arguments regarding pretext*

Even if the evidence established that Plaintiff and Hatfield were similarly situated, and Plaintiff could establish a *prima facie* case of discrimination, Fifth Thirds has proven a legitimate, nondiscriminatory business purpose for its actions. The uncontested evidence shows that Fifth Third promptly investigated the confrontation and, based on the circumstances known to Fifth Third at that time, chose to terminate Plaintiff and discipline Hatfield, without termination. Notably, Plaintiff agrees that Fifth Third, has proffered legitimate non-discriminatory reasons for terminating Plaintiff and the burden shifts back to Plaintiff to prove pretext. (*See* Doc. 66 at 19).

In an effort to rebut Fifth Third's stated reasons for Plaintiff's termination, Plaintiff alleges that Fifth Third submitted different reasons for his termination to the Office of Unemployment Compensation than those given in their instant motion for summary judgment.[1] According to Plaintiff, Fifth Third informed the Office of Unemployment

---

[1] In response to Fifth Third's motion for summary judgment, Plaintiff has supplied two documents related to his February 24, 2010 claim for unemployment benefits. (Doc. 66, marked as Exs. 9, 10). One of the documents is from the Office of Unemployment and the other appears to be a position statement and/or summary of the relevant facts. Notably, on March 17, 2010, Plaintiff's claim for benefits was denied due to "a disqualifying separation from employment…." The document further states in relevant part:

The claimant was discharged by FIFTH THIRD BANK (INC) on 2/19/2010. The employer discharged the claimant for using abusive or profane language when talking with other

Compensation that Plaintiff was "discharged for "using abusive language when talking with other employees" (Doc. 66, Ex. 9).[2]  However, Plaintiff alleges that Fifth Third changed its story and is now stating that Plaintiff was terminated for making veiled threats that "Monday is going to be a big day" and "I'll take care of it myself."  (Doc. 66 at 18-19).  In this regard, Plaintiff contends that the notes from the initial investigation show that Plaintiff's supervisor, Jason Curfiss, did not perceive such words as a serious threat. Id.[3]  Plaintiff further notes that it was only after Plaintiff filed his complaint of discrimination with EEOC that Brad Hatfield was terminated, approximately three months after Plaintiff's termination.

Such assertions, however, fail to establish that the stated reasons for Plaintiff's termination had no basis in fact; did not actually motivate the Fifth Third's decision; or were insufficient to warrant the decision.  See *Manzer,* 29 F.3d at 1084.  As outlined above, Healy testified that she made the decision to terminate Plaintiff based on the information she learned during the witness interviews, Plaintiff's hostility and refusal to cooperate during his interview, and the veiled threats Plaintiff made during his interview including "Monday is going to be a big day" and "I'll handle it myself;" Healy believed that Plaintiff would cause physical harm to Fifth Third employees if he was allowed to

---

employees. Facts establish that the claimant's actions demonstrated a disregard of the standards of behavior which an employer has a right to expect.  Ohio's legal standard that determines if a discharge is with just cause is whether the claimants acts, omission, or course of conduct were such than an ordinary person would find the discharge justifiable. After a review of the facts, this agency finds that an ordinary person would find the discharge justifiable.

[2] This document was subject to a motion to strike by Fifth Third and was subsequently stricken by the Court because it was not authenticated.  As such, the document is not properly before the Court in deciding the instant motion for summary judgment.

[3] Interestingly, Plaintiff testified in his deposition that the did not state that "Monday is going to be a big day" and "I'll take care of it myself."  (Doc. 34, at 104). However, Plaintiff's memorandum *contra,* now appears to assert that such statements are irrelevant because Curfiss did not view such statements as threats, thus, implying that such statements were in fact made.

return to work.  (Healy Depo.#2, at 58: 3-18; 71:1-14; 133: 7-17; 118:22-25; 119:1-7).

Notably, Healy's deposition states in relevant part:

> Healy:  We looked at the whole picture.  But, again, Mr. Wheat's behavior was such that he violated the workplace violence policy by making a veiled threat, and that ultimately led to his termination
>
> Counsel:  So in essence it had nothing to do – it didn't have a lot to do with the altercation he had with Brad, but it had more to do with what occurred when he was in the office with you – in the conference room the three of you?
>
> Healy:  I wouldn't characterize it that way.  I would say that certainly the altercation in the hallway was taken into consideration. Had Mr. Wheat been more cooperative and maybe explained what had occurred, perhaps Mr. Hatfield would have been terminated at the same time, but he failed to provide any details to support what happened.

(Doc. 36 at 74)

Plaintiff's own testimony also establishes that during his interview with Healy, he admitted that he called Hatfield a "bitch" several times.  Such language violates Fifth Third's professionalism policy which prohibits profanity in the work place. (Doc. 37, Ex. 16).  Plaintiff further admitted that he initiated contact with Hatfield by asking him "If he had a problem" because of the way he was looking at his "batches." (Doc. 34 at 83,84) Furthermore, the fact that Hatfield was terminated at a later date, after a subsequent investigation, fails to show that proffered explanation for terminating Plaintiff had no basis in fact and/or did not actually motivate Fifth Third's decision.  As noted by Fifth Third, the law requires Wheat to prove that Fifth Third's explanation for terminating _Plaintiff,_ is pretextual;  thus, Fifth Third's explanation for terminating Hatfield is immaterial to this determination.  _See Burnett v. Carington Health Systems_, U.S. Dist. No. 1:11–cv–324, 2012 WL 6001034 (S.D. Ohio, Nov. 30, 2012) citing _Wexler v. White's Fine Furniture_, 317 F.3d 564, 576 (6th Cir. 2003) (additional citation omitted).

In light of the foregoing, Plaintiff has failed to rebut defendant's legitimate non-discriminatory reasons for his termination and has failed to produce any evidence that Fifth Third intended to discriminate against plaintiff on the basis of race.  *See Thurman*, 90 F.3d at 1166 (citing *Hicks*, 509 U.S. at 502) ("The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race.)" Although the summary judgment standard requires that evidence of record be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court. *Diaz v. Mitchell's Salon and Day Spa, Inc.*, Case No. 1:09-cv-882, 2011 WL 379097, * 7 (S.D. Ohio 2011) (J. Weber).   Plaintiff's unsupported conclusions are insufficient to meet his burden of establishing that Fifth Third's proffered reasons for his termination were a pretext for racial discrimination.

## III. Conclusion

For these reasons, **IT IS THEREFORE RECOMMENDED THAT** Defendant's motion for summary judgment (Doc. 37) be **GRANTED** and this case is therefore **TERMINATED** on the active docket of the Court.

    *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CURTIS WHEAT,

      Plaintiff,                                    Case No. 1:11cv737

vs.                                              Chief Judge Dlott
                                                     Magistrate Judge Bowman

FIFTH THIRD BANK,

      Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).